**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-11487

_____

LUIS MANUEL RODRIGUEZ,

MARIA RODRIGUEZ,

  a.k.a. Maria Teresa Landa,

ALFREDO RAMON FORNS,

RAMON ALBERTO RODRIGUEZ,

RAUL LORENZO RODRIGUEZ, et al.,

*Plaintiffs-Appellants,*

*versus*

IMPERIAL BRANDS, PLC.,

CORPORACION HABANOS, S.A.,

WPP, PLC.,

YOUNG & RUBICAM, LLC.,

BCW, LLC.,

  a.k.a. Burson Cohn & Wolfe LLC,

*Defendants-Appellees.*

2                    Opinion of the Court                    24-11487

—————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cv-23287-DPG

—————————————

Before JORDAN, NEWSOM, Circuit Judges, and HONEYWELL,* District Judge.

NEWSOM, Circuit Judge:

The Cuban Liberty and Democratic Solidarity Act of 1996, 22 U.S.C. §§ 6021–6091—more commonly known as the Helms-Burton Act—imposes liability on any person that "traffics" in property that was confiscated by the Cuban government on or after January 1, 1959, and to which a U.S. national has a claim. The plaintiffs in this case are seven U.S. nationals and descendants of Ramón Rodriguez Gutiérrez, who owned property confiscated by the Cuban government in 1961. The plaintiffs sued several corporations alleging that they had "traffic[ked]" in that property within the meaning of the Helms-Burton Act. The district court granted the corporations' respective motions to dismiss for lack of personal jurisdiction. As relevant here, the plaintiffs now appeal the dismissal of their claims against two British corporations—Imperial Brands and WPP. Doing our best to apply the Supreme Court's recent decision in *Fuld v. Palestine Liberation Organization*, 606 U.S. 1 (2025), we hold

—————————————

* Honorable Charlene E. Honeywell, United States District Judge for the Middle District of Florida, sitting by designation.

that the federal courts lack personal jurisdiction over WPP and Imperial, and we therefore affirm the district court's dismissal of the plaintiffs' complaint.

## I

## A

Congress enacted the Helms-Burton Act in 1996 "to strengthen international sanctions against the Castro government." 22 U.S.C. § 6022(2). As relevant here, "Title III of the Act provides a private cause of action for U.S. nationals against those who knowingly traffic in property expropriated by the Cuban government after the start of the Cuban Revolution." *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 919 (11th Cir. 2023) (per curiam). Specifically, the statute states: "[A]ny person that . . . traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages . . . ." 22 U.S.C. § 6082(a)(1)(A). The term "[t]raffics" is broadly defined:

> [A] person 'traffics' in confiscated property if that person knowingly and intentionally—
>
> (i) sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,
>
> (ii) engages in a commercial activity using or otherwise benefiting from confiscated property, or

(iii) causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person,

without the authorization of any United States national who holds a claim to the property.

*Id.* § 6023(13).

**B**

The plaintiffs are U.S. nationals who allege that their property in Cuba was wrongly confiscated and then trafficked in violation of the Helms-Burton Act. They are the heirs and successors of Ramón Rodriguez Gutiérrez and the owners of a 90% interest in Ramón Rodriguez e Hijos Sociedad en Comandita (RRHSC).[1] RRHSC once owned and operated a cigarette factory in Havana, but after the Castro regime seized power, the Cuban government nationalized (among many others) the tobacco industry. As part of that takeover, the government took ownership of RRHSC and confiscated its property in 1961. At the time of the seizure, RRHSC's property included a cigarette factory and an adjacent mixed-use building.

---

[1] "We review the district court's dismissal for lack of personal jurisdiction de novo, accepting the allegations in the complaint as true." *Herederos De Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*, 43 F.4th 1303, 1307 (11th Cir. 2022), *abrogated on other grounds by Fuld*, 606 U.S. at 16.

24-11487                 Opinion of the Court                 5

The plaintiffs here initially sued a handful of related companies:

- Habanos—a Cuban corporation controlled by the Cuban government, directly or through non-party Tabacuba, Cuba's state-run tobacco monopoly. Habanos used the RRHSC factory to manufacture, sell, market, and distribute cigars. Tabacuba established offices in the mixed-use building portion of the RRHSC property.

- Imperial—a corporation incorporated and headquartered in the United Kingdom. In 2007, Imperial acquired a Spanish company, Altadis, S.A., which had a 50% noncontrolling ownership interest in Habanos. Imperial disposed of its indirect ownership interest in Habanos in 2020.

- WPP—a British holding company incorporated in the Bailiwick of Jersey with "dual-headquarters in London and New York City." Second Am. Compl. ¶ 36, Dkt. No. 208. WPP was retained, along with its subsidiaries, by Imperial, either directly or through Habanos, to assist in marketing cigars "managed from or produced or stored" at the RRHSC property. *Id.* ¶¶ 20, 61.

- Young & Rubicam LLC (Y&R) and Burson Cohn & Wolfe, LLC (BCW)—WPP's U.S.-based advertising agency subsidiaries, which were also retained to assist in marketing cigars produced at the RRHSC property. The subsidiaries are incorporated in Delaware and have their principal places of business in New York.

The plaintiffs allege that from 2010 through October 2020, WPP, together with Y&R and BCW, "continuously trafficked in the RRHSC property by marketing and publicizing the Cuban tobacco products made, stored, shipped or managed from the RRHSC property." *Id.* ¶ 21.  Starting no later than 2017, plaintiffs continue, WPP, acting through Y&R and BCW, "assisted in setting up . . . official 'portals' . . . to market Habanos products on the U.S.-based social media platforms Twitter, YouTube, and Instagram." *Id.* ¶ 22. This marketing, according to plaintiffs, "was conducted, in part, through US websites, internet domains and other US services." *Id.* ¶ 56.

The plaintiffs do not allege that Habanos cigars were sold in the United States.  Indeed, they admit in their brief that WPP's U.S. "operations were not intended to reap profit from trafficking in the United States, where the products could not be sold legally." Supp. Br. of Appellants at 37.  But the plaintiffs allege that all the defendants "participated in, or profited from, trafficking of the RRHSC property by the Cuban government." Second Am. Compl. ¶ 19.

After the plaintiffs filed their second amended complaint, all the defendants moved to dismiss.  Following some jurisdictional discovery, a magistrate judge recommended that the complaint be dismissed for improper venue.  The district court affirmed the magistrate judge as to Habanos but remanded as to the other defendants for the magistrate judge to determine whether they had waived their improper-venue defenses.

On remand, the magistrate judge concluded that the remaining defendants had indeed waived their venue defenses. Then, though, the magistrate judge recommended that Imperial's and WPP's motions to dismiss be granted for lack of personal jurisdiction and on the ground that the plaintiffs had failed to state a claim against them. The magistrate judge concluded that the plaintiffs had abandoned their argument that WPP's U.S. subsidiaries were subject to personal jurisdiction. In fact, the judge determined that the plaintiffs had abandoned *all* personal-jurisdiction arguments save for the contention that WPP and Imperial were subject to personal jurisdiction under Federal Rule of Civil Procedure 4(k)(2), which provides as follows:

> For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws.

Fed. R. Civ. P. 4(k)(2).

Following Eleventh Circuit precedent as it existed at the time, the magistrate judge recommended that the suit be dismissed for lack of personal jurisdiction as to both WPP and Imperial because the plaintiffs had failed to establish that either entity had the requisite "minimum contacts" with the United States. For support, the magistrate judge pointed to *Fraser v. Smith*, in which this Court had held that "the mere existence of a website that is visible in a

forum and that gives information about a company and its products is not enough, by itself, to subject a defendant to personal jurisdiction in that forum." 594 F.3d 842, 847 (11th Cir. 2010) (citation modified). The magistrate judge explained that the plaintiffs' theory of personal jurisdiction over Imperial hinged entirely on there being personal jurisdiction over WPP and, in turn, that personal jurisdiction over WPP hinged entirely on generally accessible websites that advertised Habanos' products. The district court adopted the magistrate judge's recommendation to dismiss for lack of personal jurisdiction.[2]

On appeal, the plaintiffs contend that personal jurisdiction does exist over WPP and Imperial. Initially, the plaintiffs argued that the defendants had the necessary minimum contacts with the United States. Following the completion of the parties' briefing, the Supreme Court decided *Fuld*, in which it held, as a matter of first impression, that the Fifth Amendment's Due Process Clause "does not incorporate the Fourteenth Amendment minimum contacts standard," 606 U.S. at 23, and instead "permits a more flexible

---

[2] The magistrate judge also dismissed for failure to state a claim, but the district court declined to adopt that portion of his recommendation after concluding that the court lacked personal jurisdiction over the defendants. On appeal, the defendants urge us to affirm the district court's dismissal for lack of personal jurisdiction, but in the alternative they assert that we could affirm on the ground that the plaintiffs failed to state a claim. Because we affirm the dismissal for lack of personal jurisdiction, we don't reach the defendants' alternative argument.

jurisdictional inquiry," *id*. at 16. *Fuld* abrogated this Court's decisions concluding that the personal-jurisdiction analyses under the Fifth and Fourteenth Amendments are the same. *See, e.g.*, *Herederos De Roberto Gomez Cabrera, LLC*, 43 F.4th at 1308.

Following oral argument, we ordered supplemental briefing on several *Fuld*-related questions. Most importantly, we asked what limits, if any, the Fifth Amendment's Due Process Clause imposes on a federal court's exercise of personal jurisdiction over a foreign defendant and, in light of those limits, whether personal jurisdiction exists in this case.

Before us, the plaintiffs agree that the Fifth Amendment imposes some limits on a federal court's exercise of personal jurisdiction—namely, they say, by way of a "reasonableness" standard of the sort to which the Supreme Court adverted in *Fuld*—but they insist there is personal jurisdiction over the defendants in this case. The defendants, by contrast, deny that *Fuld* applies here at all, but contend in the alternative that even if it does, subjecting them to personal jurisdiction would be unreasonable.

## II

Because of the seismic shift created by *Fuld*, we begin with a discussion of personal jurisdiction as it existed both before and after the Supreme Court's decision.

### A

First, some personal-jurisdiction basics. "A court must have . . . power over the parties before it (personal jurisdiction) before it can resolve a case." *Lightfoot v. Cendant Mortg. Corp.*, 580 U.S. 82, 95 (2017). This requirement "flows not from Art[icle] III, but from the Due Process Clause"—be it of the Fifth or Fourteenth Amendment. *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). In either event, "[u]ntil the court has established personal jurisdiction . . . any assertion of judicial power over the party violates due process." *Id.* at 706.

For a case arising in federal court, personal jurisdiction is (absent consent) proper only if two requirements are satisfied. As an initial matter, some federal statute or Federal Rule of Civil Procedure must authorize service of a summons on the defendant. *See Omni Cap. Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987). Separately, the exercise of personal jurisdiction must comport with due process. *See id.*; *see also Ins. Corp. of Ireland*, 456 U.S. at 702–03. Let's briefly unpack the service and constitutional requirements in turn.

First, the rules regarding the service of summons. Federal Rule of Civil Procedure 4 authorizes several means of serving a non-resident defendant. Rule 4(k)(1)(A) is the most familiar. Under that Rule, service of a summons is effective to establish personal jurisdiction if the defendant "is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Fed. R. Civ. P. 4(k)(1)(A). In other words, Rule 4(k)(1)(A) looks to the law governing exercises of personal jurisdiction in the

courts of the state in which the federal court sits.  Accordingly, a federal court may exercise personal jurisdiction over a non-resident defendant provided (1) that service is effectuated in compliance with the state's "long-arm" statute, *see* 4 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1068 (4th ed. 2026), and (2) the assertion of jurisdiction comports with the limitations imposed by the *Fourteenth* Amendment's Due Process Clause—more on that shortly.

There are also two lesser-trod paths to establishing personal jurisdiction over non-resident defendants in federal court: Rule 4(k)(1)(C) and Rule 4(k)(2).  Under Rule 4(k)(1)(C), service of process is effective to establish personal jurisdiction over a defendant "when authorized by a federal statute."  Fed. R. Civ. P. 4(k)(1)(C). Rule 4(k)(2)—the "national long-arm statute," *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000), *abrogated for other reasons by Fuld*, 606 U.S. 1—provides that "serving a summons . . . establishes personal jurisdiction over a defendant if:  (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws."  Fed. R. Civ. P. 4(k)(2).  Notably, exercises of personal jurisdiction pursuant to Rules 4(k)(1)(C) and 4(k)(2) are subject to constitutional limitations imposed by the *Fifth* Amendment's Due Process Clause, rather than the Fourteenth's. *See Herederos*, 43 F.4th at 1307.

On, then, to the constitutional constraints.  Before *Fuld*, the Supreme Court's "modern personal jurisdiction cases . . . ha[d]

grappled only with the limitations imposed by the *Fourteenth* Amendment on *state* courts." *Fuld*, 606 U.S. at 11. To be clear, that's not because personal-jurisdiction cases didn't arise in federal court, but because Federal Rule of Civil Procedure 4(k)(1)(A) often applies.

So let's start with the standard that governs exercises of personal jurisdiction under the Fourteenth Amendment. The canonical description comes from *International Shoe Co. v. Washington*, in which the Supreme Court "held that a tribunal's authority depends on the defendant's having such 'contacts' with the forum State that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice.'" *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021) (quoting *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316–17 (1945)).

This "contacts"-based focus on "the defendant's relationship to the forum State" led the Court to recognize two types of personal jurisdiction: "general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." *Id.* at 358 (citation modified). Where the defendant is "fairly regarded as at home" in a particular state, a court there has general jurisdiction and "may hear *any* claim against that defendant." *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*, 582 U.S. 255, 262 (2017). If a state court doesn't have general jurisdiction, then it must have specific jurisdiction over the particular case. "In order

for a state court to exercise specific jurisdiction, 'the *suit*' must 'aris[e] out of or relat[e] to the defendant's contacts with the *forum*.'" *Id.* (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014)). Put simply, to establish personal jurisdiction over a non-resident defendant, a plaintiff must show—in one way or the other—that the defendant had the requisite "minimum contacts" with the state.

For years, this Court had held that the personal-jurisdiction analysis under the Fifth Amendment mirrored that under the Fourteenth. *See Herederos*, 43 F.4th at 1308; *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1219 n.25 (11th Cir. 2009); *Fraser*, 594 F.3d at 850; *Sec. & Exch. Comm'n v. Marin*, 982 F.3d 1341, 1349 (11th Cir. 2020). Accordingly, we repeatedly said that "[t]he exercise of personal jurisdiction comports with due process when (1) the nonresident defendant has purposefully established minimum contacts with the forum and (2) the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice." *Herederos*, 43 F.4th at 1310 (quoting *Marin*, 982 F.3d at 1349).

Then came *Fuld*.

**B**

The Supreme Court's decision in *Fuld* made one thing absolutely clear: The Fifth Amendment Due Process Clause "does *not* incorporate the Fourteenth Amendment minimum contacts standard." *Fuld*, 606 U.S. at 23 (emphasis added). Although the Court was considerably less clear about exactly what personal jurisdiction "standard" the Fifth Amendment *does* embody, it provided hints. Because *Fuld* is the latest word, it merits extended attention.

In *Fuld*, the Court confronted a case arising under the Promoting Security and Justice for Victims of Terrorism Act (PSJVTA), which authorizes the exercise of personal jurisdiction over the Palestine Liberation Organization (PLO) and Palestinian Authority (PA) in Anti-Terrorism Act cases in the event that either entity engages in certain predicate conduct. The question was whether the exercise of jurisdiction in that case comported with the Fifth Amendment. *Id.* at 5. Making that determination required the Court to confront a question it had long reserved: Whether the Fifth Amendment's Due Process Clause "impose[s] the same restrictions on the exercise of personal jurisdiction by a federal court" as are imposed by the Fourteenth Amendment's Due Process Clause. *Id.* at 11.

The Supreme Court ultimately held that the Fifth Amendment "necessarily permits a more flexible jurisdictional inquiry" than the Fourteenth Amendment because the two provisions' respective Due Process Clauses address different sovereigns. *Id.* at 16. The Fourteenth Amendment's due process limitations, the Court reasoned, are "driven by two principles: (1) treating defendants fairly, and (2) protecting interstate federalism." *Id.* at 13 (citation modified). But, the Court observed, "interstate federalism concerns . . . do not apply to limitations under the Fifth Amendment upon the power of the Federal Government and the corollary authority of the federal courts." *Id.* at 15. Because "the United States is a distinct sovereign," *id.* at 16 (quoting *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011)), and because "the Constitution

confers upon the Federal Government—and it alone—both nation-wide and extraterritorial authority," *id.* at 15, the Fifth Amendment does not mechanically incorporate the Fourteenth Amendment's minimum-contacts standard, *id.* at 16.

So again, the *Fuld* Court clearly decoupled the Fifth and Fourteenth Amendments' personal-jurisdiction analyses. Beyond that, the Court's opinion is less definitive. Most notably for our purposes, the Court didn't expressly adopt a particular due process standard applicable to personal-jurisdiction inquiries under the Fifth Amendment—it did not, in its words, "purport to delineate the outer bounds of the Federal Government's power, consistent with due process, to hale foreign defendants into U.S. courts" under the Fifth Amendment. *Id.* at 18. It held only that the Fifth Amendment permits an exercise of personal jurisdiction under a statute like the PSJVTA, which "ties federal jurisdiction to conduct closely related to the United States that implicates important foreign policy concerns." *Id.*

To begin to understand the constraints that the Fifth Amendment imposes on the assertion of personal jurisdiction, we turn to a careful examination of *Fuld* and the statute whose constitutionality was assessed, the PSJVTA. That statute authorizes the assertion of personal jurisdiction over the PLO and PA in Anti-Terrorism Act cases if either entity (1) makes a direct or indirect payment to an imprisoned terrorist or that terrorist's family "for committing any act of terrorism that injured or killed a national of the United States," 18 U.S.C. § 2334(e)(1)(A), or (2) 15 days after the

statute's enactment continues to maintain a physical presence in the United States or "conducts any activity while physically present in the United States," *id.* § 2334(e)(1)(B).

The Court concluded that the statute was sufficiently narrow relative to its foreign-policy objectives to avoid due process concerns, *Fuld*, 606 U.S. at 19–23, and that it didn't offend any "reasonableness" requirement to assert personal jurisdiction over the PLO and PA, *id.* at 23–24. Regarding the statute's tailoring, the Court emphasized that the PSJVTA applies only to a "narrow category of claims," has targeted triggering predicates, and "limits jurisdiction to only two enumerated nonsovereign foreign entities." *Id.* at 20–21. "It is permissible," the Court wrote, "for the Federal Government to craft a narrow jurisdictional provision that ensures, as part of a broader foreign policy agenda, that Americans injured or killed by acts of terror have an adequate forum in which to vindicate their right to ATA compensation." *Id.* at 21.

Regarding the governing Fifth Amendment standard, the most the Court was willing to say was this: "[T]he prospect remains that the Fifth Amendment might entail [an] 'inquiry into the reasonableness of the assertion of jurisdiction in the particular case.'" *Id.* at 23 (quoting *Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 115 (1987)). "Reasonableness," the Court said, "will depend in each case 'on an evaluation of several factors,' including '[1] the burden on the defendant, [2] the interests of the forum State, and [3] the plaintiff's interest in obtaining relief.'" *Id.* at 24 (quoting *Asahi*, 480 U.S. at 113).

On the facts before it, the Court concluded with respect to the second listed factor that the United States "has an exceedingly compelling interest" in providing American victims of international terrorism with a forum to hold perpetrators to account. *Id.* So too, with respect to the third, the Court observed that "American plaintiffs have a strong interest in seeking justice through an ATA damages action in U. S. courts." *Id.* In analyzing the first, burden-on-the-defendant factor, the Court noted that the defendants hadn't "complain[ed] of any lack of notice or contend[ed] that litigating these cases in the United States would force them to bear an unfair or unmanageable burden." *Id.* Moreover, the Court reasoned that PLO and PA couldn't plausibly assert such a burden because they (1) are "sophisticated international organizations" with "billion-dollar budgets" that "govern a territory recognized as a sovereign state by many other countries"; (2) have had a continual "longstanding presence in the United States"; (3) were on notice that they could be haled into U.S. courts for these types of cases because they had litigated them in the United States "for decades"; and (4) by virtue of the narrowly drafted personal jurisdiction predicates in the PSJVTA, had "clear notice" that "engag[ing] in certain specified conduct would open them up to potential federal court jurisdiction." *Id.* at 24–25 (citation modified). Ultimately, the Court concluded that "the PSJVTA easily comports with the factors we have previously applied to determine the reasonableness of the exercise of jurisdiction even under the Fourteenth Amendment." *Id.* at 23–24 (citation modified).

### III

On, then, to this case. The plaintiffs argue that the federal courts may assert personal jurisdiction over the defendants under either Rule 4(k)(1)(C) or Rule 4(k)(2). We conclude that the Helms-Burton Act does not authorize the assertion of personal jurisdiction and, therefore, that Rule 4(k)(1)(C) does not apply here. Regarding Rule 4(k)(2), we conclude—in line with the Court's opinion in *Fuld*—that the Fifth Amendment Due Process Clause imposes a "reasonableness" standard and that the assertion of personal jurisdiction here over either WPP or Imperial would not be reasonable.

### A

First, plaintiffs' Rule 4(k)(1)(C) argument. As a reminder, that Rule states that service of process is effective to establish personal jurisdiction over a defendant "when authorized by a federal statute." Fed. R. Civ. P. 4(k)(1)(C). Both before the district court and in its opening briefing to this Court, the plaintiffs argued that personal jurisdiction was authorized under Rule 4(k)(2) alone. It wasn't until briefing had concluded that, in a notice of supplemental authority, the plaintiffs argued for the first time that Rule 4(k)(1)(C) applied because, they said, "Helms-Burton authorizes personal jurisdiction based on trafficking in wrongfully confiscated property." Pls.' Notice of Supp. Authority at 1–2, June 30, 2025 (citing 22 U.S.C. § 6081(9)-(11)).

The defendants contend that the plaintiffs forfeited any Rule 4(k)(1)(C) argument and that, even if they didn't, the Helms-Burton

Act doesn't authorize personal jurisdiction here.  Because we agree with the defendants that the Helms-Burton Act doesn't authorize personal jurisdiction over the defendants, we needn't wade into the forfeiture dispute.

In *Omni Capital*, the Supreme Court declined to hold that a federal statute "implied[ly]" authorized nationwide service of process, emphasizing that Congress knows how to provide for such service explicitly when it wants to.  *See* 484 U.S. at 106–08.  This case is similar.  The plaintiffs here don't point to any language in the Helms-Burton Act that expressly authorizes personal jurisdiction over foreign defendants.  Instead, they argue that the authorization is implied by a statutory finding that "[t]he United States Government has an obligation to its citizens to provide protection against wrongful confiscations by foreign nations and their citizens, including the provision of private remedies." 22 U.S.C. § 6081(10).  That isn't an express authorization—nor, we think, is it even particularly compelling evidence of implied authorization.  Following the logic and rationale of *Omni Capital*, we decline to hold that Helms-Burton impliedly authorizes personal jurisdiction over foreign defendants.  Accordingly, Rule 4(k)(1)(C) is inapplicable.

**B**

We proceed, then, to the plaintiffs' argument that we may exercise personal jurisdiction over the defendants under Rule 4(k)(2).  We begin by addressing *Fuld*'s impact on any Rule 4(k)(2)

analysis. We then proceed to apply the "reasonableness" test suggested by the Court in *Fuld*.

**1**

Rule 4(k)(2) has two requirements. Service of process establishes personal jurisdiction over a defendant on a federal claim if "(A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2).

For purposes of Rule 4(k)(2), "the relevant constitutional provision . . . is the Fifth Amendment's Due Process Clause, which applies to the federal government and its courts, not the Fourteenth's, which applies to the states." *Herederos*, 43 F.4th at 1307. Because *Fuld* interpreted the Fifth Amendment Due Process Clause, *Fuld* applies squarely to cases, like this one, in which the plaintiffs assert that they established personal jurisdiction via Rule 4(k)(2).

WPP and Imperial contend that *Fuld* is irrelevant to our Rule 4(k)(2) analysis because *Fuld* "is limited to cases where Congress has authorized personal jurisdiction such that service is permitted under Rule 4(k)(1)(C)." Supp. Br. of Appellees at 3. Respectfully, we disagree. True, the *Fuld* Court acknowledged that "[a]ny difference between the Fifth and Fourteenth Amendments is . . . implicated in only a subset of federal cases, such as those in which personal jurisdiction is—as in the PSJVTA—'authorized by a federal statute.'" *Fuld*, 606 U.S. at 11 (quoting Fed. R. Civ. P. 4(k)(1)(C)).

24-11487                Opinion of the Court                21

But the Court did not in that passage limit its holding exclusively to Rule 4(k)(1)(C) cases, in particular. Instead, the Court said that Rule 4(k)(1)(C) cases are exemplary of the "subset of federal cases"—note the "such as"—in which the difference between the Fifth and Fourteenth Amendment matters. *Id.* Rule 4(k)(2) cases also fall within that subset.

WPP and Imperial separately contend that a Fourteenth-Amendment-style minimum-contacts requirement should be read into Rule 4(k)(2) because the Advisory Committee Notes to the 1993 amendments to Rule 4 suggest that the drafters expected a nationwide minimum-contacts analysis to be relevant to the Rule's application. *See Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1218 n.23 (11th Cir. 2009) (quoting Advisory Committee's Note to 1993 amendments to Rule 4). Specifically, those notes state that subsection (k)(2) was added to "correct[] a gap in the enforcement of federal law"—that is, to fix the "problem" presented

> when the defendant was a non-resident of the United States having contacts with the United States sufficient to justify the application of United States law and to satisfy federal standards of forum selection, but having insufficient contact with any single state to support jurisdiction under state long-arm legislation or meet the requirements of the Fourteenth Amendment limitation on state court territorial jurisdiction.

Fed. R. Civ. P. 4(k) advisory committee's notes to 1993 amendments.

We think WPP and Imperial are making too much of too little. Whatever one might try to read into the committee notes' use of the word "contacts," the simple fact is that the Rule's text permits personal jurisdiction provided that "exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2)(B). We think the Rule's language is best read simply to require compliance with the Constitution, not as a prescription of any particular rule. And for reasons already explained, in the wake of *Fuld*, we think it clear that the Fifth Amendment's Due Process Clause doesn't impose a formal minimum-contacts requirement.

Which brings us to the merits of a *Fuld*-informed Rule 4(k)(2) analysis: WPP and Imperial don't dispute that the first prong of Rule 4(k)(2) is satisfied—*i.e.*, that they aren't subject to jurisdiction in any state's courts of general jurisdiction. Thus, our analysis focuses on prong two: Whether the plaintiffs established that exercising jurisdiction over WPP and Imperial "is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2)(B).

While the *Fuld* Court didn't chart the precise contours of a proper Fifth Amendment due process analysis, it provided guideposts by which to determine whether an assertion of personal jurisdiction transgresses constitutional limits. First, and more generally, we know that any limitations on jurisdiction imposed by the Fifth Amendment are animated by concerns about "treating defendants fairly." *See Fuld*, 606 U.S. at 13, 15. Importantly, in that

24-11487                Opinion of the Court                23

vein—and as we'll explain in more detail next—*Fuld* strongly implied that the Fifth Amendment entails some sort of "reasonableness" criterion. *Id*. at 23. Second, and more specifically, we know that asserting personal jurisdiction over foreign defendants like the PLO and PA, which "have decades of 'meaningful contacts, ties, [and] relations'" with the United States, doesn't impose an unreasonable burden. *Id*. at 22 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

### 2

The *Fuld* Court suggested that the Fifth Amendment "might entail" an "inquiry into the reasonableness of the assertion of jurisdiction in the particular case." *Id*. at 23 (quoting *Asahi*, 480 U.S. at 115). Without definitively "determin[ing] whether such analysis is constitutionally required," the Court posited that a "[r]easonableness" inquiry "will depend in each case 'on an evaluation of several factors,' including [1] 'the burden on the defendant, [2] the interests of the forum State, and [3] the plaintiff's interest in obtaining relief.'" *Id*. at 23–24 (quoting *Asahi*, 480 U.S. at 113). Because the *Fuld* Court evaluated the exercise of personal jurisdiction over the defendants before it for "reasonableness," and because the plaintiffs here concede that the Fifth Amendment imposes a "reasonableness" requirement, we will evaluate the three factors laid out in *Fuld* to determine whether assertion of jurisdiction over WPP and Imperial is reasonable.

For ease of analysis, we'll take *Fuld*'s reasonableness factors in reverse order—from the most straightforward to the most involved.

### a

Taking the third factor first, we think it clear—and the defendants don't meaningfully dispute—that the plaintiffs have a strong interest in vindicating their rights under the Helms-Burton Act. And because they are U.S. nationals, this country's courts are the only tribunals in which they can do so. So, Factor 3 counts in favor of recognizing personal jurisdiction.

### b

Next up, the second reasonableness factor—the interest of the forum state. In *Fuld*, the Supreme Court concluded that the United States had "a substantial interest in adjudicating" the dispute before it, in part, because of the "close connection" between the PSJVTA's predicate conduct and this country. *Id.* at 24. The Court wrote that "[f]ar from haling just any run-of-the-mill private defendant into American courts, the PSJVTA represents but one targeted aspect of a multifaceted foreign policy toward these two *sui generis* foreign entities, both of which exercise governmental functions in a geopolitically sensitive region and have decades of meaningful contacts, ties, and relations" with the United States. *Id.* at 22 (citation modified). The Helms-Burton Act is much broader than the PSJVTA and contains no similar jurisdictional predicates. Unlike the PSJVTA, the Helms-Burton Act does seem to assert lia-

bility over "run-of-the-mill private defendants": The Act is not targeted at "two *sui generis* foreign entities" but rather at "any person that . . . traffics" or has a connection to the trafficking of property confiscated by the Cuban government after 1959 to which a U.S. national has a claim, regardless of whether that "person" has a connection to this country. 22 U.S.C. § 6082(a)(1)(A). While the United States undoubtedly has an interest in providing a forum in which American victims can sue foreigners who wrongfully traffic in their property, we think the breadth of the Helms-Burton Act, which targets persons whose activity does not necessarily have a close connection to this country, suggests that the United States's interest here is more attenuated than it was in *Fuld*.

### c

Lastly, *Fuld*'s first reasonableness factor—the burden on the defendants. In *Fuld*, the defendants didn't contend that they lacked notice or that forcing them to litigate in the United States would impose an unfair burden. 606 U.S. at 24. Here, both defendants do. Because WPP's and Imperial's "burden" theories differ slightly, we'll analyze them separately.

### i

We start with WPP. For reasons we'll explain, the burden on WPP would be "severe." *Asahi*, 480 U.S. at 114.

Perhaps most obviously, recognizing personal jurisdiction over WPP could well require a U.K.-based company to dispatch officers and employees across an ocean to the Southern District of Florida to defend this suit in a foreign nation's judicial system. And

not insignificantly, we think, U.K. law bars U.K.-incorporated companies like WPP and Imperial both from complying with Title III of the Helms-Burton Act and from defending against Title III lawsuits without authorization from the government of the United Kingdom.  *See* The Extraterritorial US Legislation (Sanctions against Cuba, Iran and Libya) (Protection of Trading Interests) Order 1996, SI 1996/3171 (making it an offense to breach Articles 2 or 5 of European Union Council Regulation (EC) No. 2271/96 of November 22, 1996 (1996 O.J. (L 309/1) 2271)); The Protecting against the Effects of the Extraterritorial Application of Third Country Legislation (Amendment) (EU Exit) Regulations 2020, SI 2020/1660 (retaining the previous regulation with amendments upon the United Kingdom's exit from the EU).

Moreover, and in any event, unlike the defendants in *Fuld*, WPP (1) had no clear statutory notice that profiting from its subsidiaries would expose it to suit in U.S. courts, (2) didn't itself engage in predicate conduct bearing a meaningful connection to the United States, and (3) lacked a strong presence in this country.

First, the lack of clear statutory notice.  Unlike the PSJVTA, which not only included a specific grant of jurisdiction but also explicitly identified the PLO and PA by name, the Helms-Burton Act lacks any express jurisdictional predicates.  As relevant here, the Helms-Burton Act states that "a person 'traffics' in confiscated property if that person knowingly and intentionally . . . causes, directs, participates in, or profits from, trafficking . . . by another per-

24-11487                Opinion of the Court                    27

son, or otherwise engages in trafficking . . . through another person, without the authorization of any United States national who holds a claim to the property." 22 U.S.C. § 6023(13)(A).[3]  Far from the sort of by-name targeting exhibited in the PSJVTA, the Helms-Burton Act thus sweeps broadly.  The fact that an entity engages in covered conduct doesn't necessarily mean that it has a meaningful relationship with the United States.  Accordingly, the Helms-Burton Act does the very thing the *Fuld* Court seemed to condemn:  It asserts liability over "run-of-the-mill private defendants" that may not have "meaningful 'contacts, ties, [and] relations' with the United States." *Fuld*, 606 U.S. at 22 (quoting *Burger King*, 471 U.S. at 472).  We therefore conclude that it can't fairly be said that the Act gave WPP clear notice that its alleged actions would expose it to suit in U.S. courts.

Second, the conduct in which WPP is alleged to have engaged—profiting through its subsidiaries' relationships with Habanos—had no meaningful relationship to the United States.  Even if WPP's subsidiaries might have engaged in conduct with a meaningful relationship to this country, their conduct and contacts can't

---

[3] The plaintiffs contend that WPP was on notice that it could be haled into court under the Helms-Burton Act because it acknowledged in a U.S. Securities and Exchange Commission filing that the Group is "subject to the laws of the U.S."  But WPP's general acknowledgement that it is subject to U.S. law doesn't undercut its argument that a specific statute—the Helms-Burton Act—fails to provide clear notice of what conduct could subject it to personal jurisdiction.

28                    Opinion of the Court                    24-11487

fairly be imputed to WPP.[4]  Under hornbook corporate-separate-ness principles, which *Fuld* didn't purport to jettison or alter, the actions of a foreign parent company's subsidiary can't be imputed to the parent for personal-jurisdiction purposes absent a showing that the sub is nothing more than an alter ego of the parent such that veil-piercing is proper.  *Compare, e.g.*, *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1272 (11th Cir. 2002), *with, e.g.*, *Herederos*, 43 F.4th at 1312.

In *Meier*—a particularly extreme case—we concluded that a foreign parent's subsidiaries fell into the alter-ego exception.  288 F.3d at 1272–74.  There, the subs were wholly owned by their parent, conducted business exclusively for their parent, were "provide[d] day to day accounting services" by their parent, and inter-mingled their finances with their parent.  *Id.* at 1272.  In *Herederos*, by contrast, we concluded that the subsidiaries weren't mere alter egos because they were " legally distinct entities and observe[d] all corporate formalities" in that each "ha[d] its own board of direc-tors, officers, books of account, and separate taxes."  43 F.4th at 1312.  The facts that "some of [the parent's] corporate officers or leadership [were] also officers of [its] U.S.-based subsidiaries" and that the parent "consolidate[d] its financial statements with those of its US- subsidiaries" were not alone "sufficient to establish a sub-sidiary's alter-ego status."  *Id.* (citation modified).

---

[4] WPP's U.S.-based subsidiaries used U.S.-based websites and social media por-tals to "provid[e] marketing and advertising services for Habanos."  Second Am. Compl. ¶ 62.

This case is more like *Herederos* than *Meier*. To support the conclusion that Y&R and BCW "act as alter egos" of WPP, the plaintiffs principally point to coordination of finances. Second Am. Compl. ¶ 46. Specifically, they allege that "WPP centrally coordinated [its subsidiaries'] financial matters, reporting, control, treasury, tax, mergers, acquisitions, investor relations, legal affairs and internal audit from its headquarters." *Id*. While coordination of that sort could be used to build a case that WPP's U.S. subs are mere alter egos of WPP, we don't think that the plaintiffs' allegation standing alone is enough. In *Herederos*, we said that consolidation of financial statements was insufficient to establish alter-ego status where the parent and subsidiary observed other corporate formalities. *See* 43 F.4th at 1312. That WPP performs some coordinating functions for its subsidiaries doesn't show that it wholly controls the subs or that they don't observe other corporate formalities.

Finally, presence. Standing alone, the plaintiffs' allegation that WPP has dual headquarters in London and New York is not enough to establish that asserting personal jurisdiction is reasonable here. There are no allegations that WPP engaged in conduct at its New York office that had any relationship to the conduct on which the plaintiffs' trafficking claims are predicated.[5] And, the

---

[5] One might posit that because the *Fuld* Court concluded that the Fifth Amendment Due Process Clause is more forgiving, the Fourteenth Amendment's "specific jurisdiction" requirement that in-forum contacts bear some relationship to the alleged harm shouldn't apply in the Fifth Amendment context. *See Bristol-Myers Squibb*, 582 U.S. at 262. Perhaps. But we don't think we have clear enough warrant in *Fuld* to decree that new rule. In any event, when

plaintiffs abandoned the theory that WPP had a principal place of business in New York and therefore had a presence sufficiently continuous to subject it to general jurisdiction in that state. *See* Tr. of Hr'g on Personal Jurisdiction at 167, Dkt. No. 341. Thus, WPP's presence in the United States looks nothing like the PLO's and PA's "longstanding" presence here. *Fuld*, 606 U.S. at 24.[6]

### ii

For similar reasons, we conclude that the burden on Imperial would be "severe." *Asahi*, 480 U.S. at 114.

Like WPP, Imperial lacked clear statutory notice that it could be haled into U.S. courts. The plaintiffs contend that Imperial was on notice that it could be sued under the Helms-Burton Act because in a 2007 "Response" to an inquiry from the U.S. Securities and Exchange Commission, the company acknowledged that its business in Cuba "will become more significant as a result of Altadis' 50% ownership interest in Corporacion Habanos S.A." and that "Altadis' cigar operations in Cuba could be materially limited by the operation of . . . [the Helms-Burton Act]." Second Am.

---

weighed alongside and against the lack of notice, etc., we don't think that any "presence" indicated by the dual headquarters tips the scale.

[6] Another key difference: Unlike WPP, the PLO and PA aren't just commercial businesses, but rather political organizations that are recognized by some nations as sovereign and have created substantial global connections through the "maintain[ence of] embassies, missions, and delegations around the world." *Fuld*, 606 U.S. at 24.

24-11487                Opinion of the Court                31

Compl. Ex. 4 at 3, Dkt. No. 208-4. Certainly, Imperial acknowledged that the Helms-Burton Act could affect its Cuban business operations, but we don't think Imperial's acknowledgement serves as evidence that it was on notice it could be sued in U.S. courts for the conduct at issue in this case.

Likewise, there is no contention that Imperial had any offices in the United States or itself engaged in conduct in this country. Instead, the plaintiffs seek to impute to Imperial the actions of WPP's U.S. subsidiaries because, the plaintiffs say, those subs acted as "agents" of Habanos, which they claim was a "joint venture" of Imperial and Tabacuba. But Habanos was controlled by Cuba, not by Imperial. Even if the plaintiffs could establish that WPP's U.S. subsidiaries acted as agents for Habanos, they haven't alleged enough to establish that those subs acted as Imperial's agents, and the fact that the subs helped market Habanos' products through U.S-based platforms doesn't change that.

★ ★ ★

Under the particular circumstances presented, we hold that subjecting WPP and Imperial to jurisdiction in the United States would impose an unreasonable burden on both companies. The Helms Burton Act gave neither clear notice that they could be sued in U.S. courts; neither engaged in any conduct related to the trafficking claims that had a meaningful relationship to the United States; and neither had any significant presence in this country.

## IV

Without quite holding as much, the Supreme Court in *Fuld* strongly suggested that the Fifth Amendment imposes a "reasonableness" limitation on a federal court's exercise of personal jurisdiction over foreign defendants. 606 U.S. at 23. Any reasonableness assessment necessarily entails consideration of several factors, is context-dependent, and operates on a case-by-case basis. *See id.* at 24. In the particular circumstances presented here, we hold that it would be unreasonable to subject WPP and Imperial to jurisdiction in this case. Accordingly, we **AFFIRM** the district court's dismissal of the plaintiffs' complaint for lack of personal jurisdiction.[7]

---

[7] Again, because we affirm on jurisdictional grounds, we needn't address the alternative grounds for dismissal that WPP and Imperial assert on appeal.